```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/29/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA,                                  :
                                                           :          18-CR-833 (VSB)
                v.                                         :
                                                           :          **OPINION & ORDER**
CHRISTOPHER SANCHEZ,                                       :
                                                           :
                                        Defendant.         :
                                                           :
-----------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

      Before me is the motion of Christopher Sanchez ("Defendant" or "Sanchez") for release pursuant to 18 U.S.C. § 3582 (c)(1)(A), because "Christopher Sanchez is at high risk of severe illness and death from COVID-19 as a result of his obesity and an atrioventricular canal defect for which he had heart surgery as a child." (Sanchez Comp. Rel. Mem. 1.)[1] Because Sanchez is not in federal custody—he is currently being held in the Orange County Jail (the "Jail")—he claims, and the Government does not dispute, that the Bureau of Prisons cannot assess whether or not compassionate release is appropriate. Therefore, I need not address whether or not Sanchez needs to exhaust his administrative remedies.[2] However, because I find that Sanchez has not met his burden of establishing that there exist extraordinary and compelling reasons to

---

[1] "Sanchez Comp. Rel. Mem." refers to Christopher Sanchez's Emergency Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A). (Doc. 60.)

[2] Neither party addressed whether Sanchez was in state custody completing his sentence for violating the terms of his parole or whether he was merely being housed in the Jail and is serving his federal sentence. However, at Defendant's guilty plea defense counsel indicated that Defendant's sentence for his violation of parole was due to end in December 2019. (Doc. 50 at 34:11.) I have confirmed with the assistance of the United States Probation Office for the Southern District of New York that Sanchez appears to be serving his federal sentence in a state facility. I note that if I am wrong and Sanchez is still serving his sentence for violating his parole that I would not have authority to modify his state sentence pursuant to Section 3582(c). *See Williams v. Keiser*, No. 17-CV-1040, 2020 WL 2028256, *2 (W.D.N.Y. Apr. 28, 2020).

reduce his sentence and grant his release, Defendant's motion for compassionate release is denied without prejudice.

I. **Background and Procedural History**[3]

In the late evening on July 30, 2018, surveillance video recording the entrance to an apartment building at 3550 Bivona Street, Bronx, New York depicts Sanchez holding what appears to be a firearm while speaking with another individual. (Compl. ¶ 3.a.) During his sentencing, Sanchez confirmed his possession of a firearm on July 30, 2018. As his counsel explained during Sanchez's sentencing hearing, Sanchez had taken the firearm away from a drunk friend who had gotten into a verbal dispute with some other people. (Doc. 58 at 16:21-17:5, "And so what happened was his friend . . . is drunk. And there is video footage from surveillance of him falling down in an elevator. He's drunk. And he gets into an altercation outside that building with some people. And Mr. Sanchez was not a party to that altercation. So what happens is Mr. Sanchez gets the gun away from his friend, and then pushes the people apart. And in so doing, he displays the gun. He displays it to his friend, he displays it to the other people. He doesn't point it at anybody.").

Approximately 45 minutes to an hour later that evening, surveillance video outside an apartment building at 3475 Bivona Street, Bronx, New York ("3475 Bivona") depicts Sanchez standing in a walkway in front of 3475 Bivona (the "3475 Bivona Walkway"). The video further depicts Sanchez reach into his pants and then collapse onto the ground near a fence bordering the 3475 Bivona Walkway, rise to his feet, and proceed to limp, favoring his left leg, towards vehicles parked alongside a sidewalk adjacent to the 3475 Bivona Walkway. Sanchez's counsel

---

[3] The facts contained in this section are taken from the allegations in the criminal complaint filed on October 10, 2018. ("Complaint" or "Compl."), (Doc. 1), Sanchez's guilty plea, (Doc. 8), and Sanchez's sentencing, (Doc. 58).

explained what transpired stating:

> So what happens is they kind of – they are in the apartment building. And, like, they go upstairs. And you can see in the elevator that Mr. Sanchez is, like, yelling at his friend, telling him to calm down, because he's getting into this fight.
>
> And the friend goes back out, and they all go back out. And so the friend goes out first. He's going across. So these buildings – I've been there, because we were about to try this case. These buildings are across kind of a wide street from one another. It's public housing.
>
> And so the friend goes across the street into the other building. And Mr. Sanchez trails behind him, because Mr. Sanchez has been asked by the friend's mother to kind of look after him. And so he trails behind him. He's waiting for the friend outside.
>
> And that's when one or more people who are, I think, related to the people in the previous altercation, start shooting. It's not actually clear that they are shooting at Mr. Sanchez or they are shooting at the friend, because at the moment this happens, right before it happens, the friend, who's also there, he's coming back out of the lobby and he sort of runs past. And so it's sort of unclear who they are shooting at, but they are shooting at those two guys. And obviously they are together, Mr. Sanchez and the friend.

(*Id*. 17:18-18:16.) The parties essentially agree to all of the facts except whether or not Sanchez shot himself or was shot by someone else. As is clear from the above, the defense believes Sanchez was shot. At the time of the filing of the Complaint the Government believed that Sanchez shot himself; however, at sentencing the Government said "we don't take a view either way." (*Id*. 12:16.) The parties appear to agree that Sanchez had a firearm from the time he is seen displaying it until he is shot, and Sanchez admits that he possessed "three ammunition cartridges" and that he had "just finished coming home from imprisonment for a crime that was punishable for exceeding one year." (Doc. 50 at 38:19-22.)

The Complaint was filed on October 10, 2018, (Doc. 1), and Defendant was arrested on October 16, 2018, and consented to detention without prejudice to making a bail application in the future, (Doc. 5). The Indictment was filed on November 15, 2018. (Doc. 7.) A superseding

3

indictment was filed on August 8, 2019. (Doc. 41.) The parties agreed that an evidentiary hearing was necessary to resolve Sanchez's motion to suppress which was filed on January 25, 2019, (Doc. 12), the Government opposed this motion on March 8, 2019, (Doc. 18), a hearing was held on April 25, 2019, and post hearing briefs were received on May 17, 2019, (Docs. 23, 24). I granted Defendant's motion to suppress on June 20, 2019. (Doc. 26.) By Order dated July 1, 2019, I set a schedule for pretrial submissions, (Doc. 29), on August 2, 2019, I held a final pretrial conference, and the parties appeared for jury selection on August 26, 2019. Defendant decided to plead guilty on August 26, 2019. (*See generally*, Doc. 50.) Although the Probation Office recommended a sentence of 60 months' imprisonment, and the Government a sentence within the range it had agreed to with Defendant of 33 to 41 months' imprisonment, I sentenced Defendant to 18 months' imprisonment on December 18, 2019, in part based upon the fact he had not received credit for much of the time he had been in custody on the underlying charges because of his state parole violation. (Doc. 58 at 8:21-23; 9:2-7; 21:5-11; 27:15-28:1.)

## II.     Discussion

Defendant argues he is "at high risk of severe illness and death from COVID-19 as a result of his obesity and an atrioventricular canal defect for which he had heart surgery as a child." (Sanchez Comp. Rel. Mem. 1.) He also argues that his incarceration at the Jail exacerbates this risk because of "COVID-19's arrival and rapid spread in Orange County, NY". (*Id*.) Sanchez then argues that these facts and conditions constitute extraordinary and compelling reasons warranting a reduction in his sentence to time served and release "to a period of home confinement until his sentence expires on April 17, 2021, pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), so that he can seek safety in the family home available to him in The Bronx." (*Id*.) In opposition the Government argues that Sanchez has not

demonstrated that his "obesity and childhood heart condition—which he declined to mention in his presentence interview—are sufficiently serious to constitute an 'extraordinary and compelling reason' that warrants temporary release," and that Sanchez—twice convicted of robbery and who possessed a loaded firearm in relation to the instant offense—cannot demonstrate that he is not a danger to the community.  (Govt. Opp. 1.)[4]

Because the Government does not object to Defendant's argument that he need not exhaust his administrative remedies because he is not in BOP custody, I find that it has effectively waived that argument.[5]  *See United States v. Gentille*, No. 19 Cr. 590 (KFP), 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020) ("The Court agrees with the Government that § 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional, but rather is a claims-processing rule that the Government can waive by failing to raise an exhaustion argument."); *United States v. Jasper*, No. 18 Cr. 390-18 (PAE), Dkt. 440 (in which the Government stated in a letter to the court that "[a]lthough the defendant has not exhausted her administrative remedies pursuant to 18 U.S.C. § 3582(c)(1)(A), based on the particular circumstances of this case, the Government has concluded that it is appropriate to waive the exhaustion requirement.").  Therefore, I do not consider the exhaustion issue and move directly to consider the substance of Defendant's motion. I find that Sanchez has not established extraordinary and compelling reasons warranting a reduction in his sentence and his release from prison because:  (1) he has not established that the heart condition he suffered from as a child puts him at increased risk of serious illness or death should he contract COVID-19; (2) he has not established that his obesity puts him at increased

---

[4] "Govt. Opp." refers to the Government's letter in opposition to Defendant's motion, Doc. 64.

[5] Here, unlike in *United States v. Ng*, S5 15-CR-706 (VSB), 2020 WL 1301202 *4, (S.D.N.Y. May 8, 2020), I decline to address the exhaustion issue because Sanchez is not in BOP custody; therefore, BOP is not in a position to evaluate his compassionate release request.

risk of serious illness or death should he contract COVID-19; (3) even if Sanchez was able to establish that his health conditions placed him at increased risk of serious illness or death should he contract COVID-19, he has not demonstrated that he would be less at risk were he released and subject to home confinement in the Bronx; and (4) Sanchez's criminal history and the circumstances of the offense of conviction support a finding that he presents a danger to the community and the conditions of release he proposes does not sufficiently mitigate that danger.

### A.     Applicable Law

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, No. 02 CR 743-07 (CM), ---F.Supp.3d---, 2020 WL 497987, at *1 (S.D.N.Y. Jan. 15, 2020).  Section 3582(c)(1)(A)(i), the compassionate release statute, provides one such exception.  The compassionate release statute permits a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[6]  18 U.S.C. § 3582(c)(1)(A).  The moving party bears the burden of proving that extraordinary and compelling reasons exist.  *See United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.")); *see also United States v.*

---

[6] The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13, although I note that the Sentencing Guidelines have not yet been revised to take into account the First Step Act. *See United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, *3 (S.D.N.Y. Apr. 3, 2020).  The relevant section provides that a court may reduce the term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction," *id*. § 1B1.13(1)(A); (2) "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id*. § 1B1.13(2); and (3) "the reduction is consistent with this policy statement," *id*. § 1B1.13(3).  The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist." *Id*. § 1B1.13 Application Note 1.

*Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) ("[I]f the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease." (quoting *Butler*, 970 F.2d at 1026)); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

Until recently, a court could not order compassionate release unless the BOP requested such relief on a prisoner's behalf by filing a motion. *See* U.S.S.G. § 1B1.13 (stating, among other things that "[u]pon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)"); *see also Gotti*, 2020 WL 497987, at *1 ("Until last December, a court could not modify a defendant's duly-imposed sentence on compassionate release grounds unless it received a motion from the Bureau of Prisons asking that the court consider such modification.")  However, in December 2018, Congress passed the First Step Act, which did away with BOP's unilateral ability to deny a prisoner compassionate release but did not remove the BOP from the process entirely. *See id.*  The statute is clear that a court may only grant compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

    **B.**    *Application*

        **1. Exhaustion**

As mentioned above, the Government does not challenge Defendant's argument that

since he is not in BOP custody he need not attempt to exhaust his administrative remedies and can seek compassionate release without application to BOP.  Therefore, under the specific facts and circumstances presented here, including the Government's apparent waiver, I only address the substance of Defendant's motion.  *See supra* at 5.

### 2. Extraordinary and Compelling Circumstances

    a. <u>Defendant has not Established his Heart Condition Puts him at Increased Risk</u>

Defendant claims that as a child he had surgery for an "atrioventricular canal defect". (*See* Sanchez Comp. Rel. 1, 9.)  Although Defendant's mother and grandmother reference his having had heart surgery as a child in their letters submitted in connection with his sentencing, Sanchez has not provided any records, medical or otherwise, that specifically discuss his heart condition at the time it was diagnosed, the surgery to repair the defect, or any subsequent treatment he has received since the surgery.  The only record Sanchez provided from around the time of the surgery is attached as an exhibit to his reply memorandum—a letter stating that Maritza Sanchez cannot work because she needs to care for Sanchez when he comes home from the hospital—but it does not provide any substantive information about his heart condition or his surgery.  (*See* Sanchez Reply, Exhibit A.)[7]  In other words, there is no support that Sanchez's past heart condition and surgery left him with a weakened heart—as he claims, (*see* Sanchez Comp. Rel. 16; Sanchez Reply 9), or that he has any current health conditions or problems as a result of his past heart condition and surgery.  In fact, Sanchez reported to Probation during the interview related to the preparation of his Presentence Investigation Report ("PSR") that other than some residual effects from the gunshot wound related to the instant offense "he is in good

---

[7] "Sanchez Reply" refers to Defendant's Reply in Support of His Emergency Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i).  (Doc. 67.)

8

physical health," (PSR ¶ 53), and there is no indication in the PSR that he mentioned his prior heart condition and surgery.  Therefore, I find that Sanchez has not demonstrated that his stated prior heart condition and surgery place him at increased risk for serious illness and death should he contract COVID-19, and therefore it cannot qualify as an extraordinary and compelling reason for me to reduce his sentence to time served, direct his release him from prison, and direct his home confinement in the Bronx.

          b.   <u>Defendant Has Failed to Establish That His Alleged Obesity Puts Him at Increased Risk</u>

Defendant claims that he is obese and that his obesity puts him at high risk of severe illness and death from COVID-19.  (*See* Sanchez Comp. Rel. 1, 9-11, 14-17; Sanchez Reply 5-9.)  The Government argues that Sanchez's obesity does not place him at higher risk for serious illness and death because the Centers for Disease Control and Prevention ("CDC") includes severe obesity, (*Groups at Higher Risk for Severe Illness, Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention (last visited May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity), but not obesity as a factor that places people at increased risk.  The Government also points out that as a 24 year-old Sanchez is "not at risk due to his age," and argues that therefore "there is reason to doubt that Sanchez's weight alone puts him at significant higher risk."  (Govt. Opp. 6.)  As discussed below, based upon the evidence at best Defendant has established that it is equally likely he is at an increased risk of serious illness and death as it is that he is not at an increased risk; therefore, Defendant has failed to meet his burden.

The use of body mass index ("BMI") and its impact on health is more complicated than merely using the BMI as an indicator for potential health problems.  Although Sanchez is correct that certain recent studies have indicated that obesity could be an indicator for increased risk to

9

individuals who contract COVID-19, the CDC has yet to adopt that view. Sanchez's citation to his BMI—33.4—is an over simplification. As an initial matter, Defendant only cites to his PSR as proof that he is obese; although it is not clear whether Sanchez was weighed as part of his presentence interview, he reported his own weight to the Probation Officer, or whether the Probation Officer obtained Sanchez's weight from a document like Sanchez's Record of Arrests and Prosecutions ("RAP") sheet. (*See* PSR ¶ 52.) Therefore, it is not clear what the actual source is for Defendant's weight or what his current weight is some six months after his PSR was last revised on November 19, 2019. In any event, I will assume that Sanchez's current weight is 220 pounds. Sanchez's argument assumes that any BMI above 30 automatically places him at increased risk, but he does not cite to any information analyzing the purported impact on individuals with BMIs between 30—the BMI level at which obesity begins—and 40—the level at which severe obesity begins and where the CDC has stated "puts people at higher risk for complications from COVID-19." (*Groups at Higher Risk for Severe Illness, Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention (last visited May 27, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#severe-obesity.) In addition, Defendant only cites to his BMI, which itself is just an estimate and is a measure of body fat based on height and weight that applies to adult men and women. (*Assessing your Weight and Health Risk,* National Heart, Lung, and Blood Institute, (last visited May 27, 2020) https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm.) "Although BMI can be used for most men and women, it does have some limits:" (1) "[i]t may overestimate body fat in athletes and others who have a muscular build"; and (2) "[i]t may underestimate body fat in older persons and others who have lost muscle." (*Id*.) It is possible that the BMI for Defendant may be an overestimation of his body fat, and neither party has

submitted evidence concerning Defendant's body type. Further, the BMI is only one factor in assessing the health risks associated with weight. "Assessment of weight and health risk involves using three key measures:" (1) BMI; (2) "[w]aist circumference"; and (3) "[r]isk factors for diseases and conditions associated with obesity." (*Id.*)

Accordingly, I find that Defendant has not met his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his release because he has failed to demonstrate that his obesity increases his risk of serious illness or death should he contract COVID-19.

c. Section 3553(a) Factors

As an initial matter, as section 3582(c)(1)(A) directs, before reaching the issue of whether Sanchez as established extraordinary and compelling reasons warranting a reduction in his sentence and he release from custody, I must consider the factors set forth in 18 U.S.C. § 3553(a). After considering those factors, I find that they militate against a sentence of time served.

Granting Sanchez compassionate release would require the reduction of his sentence to time served. Assuming that April 17, 2021, is Defendant's correct release date, (*Find an Inmate*, Federal Bureau of Prisons (last visited May 28, 2020), https://www.bop.gov/inmateloc/), this would mean the 18 month sentence I imposed would be reduced by more than 10 months. After considering the section 3553(a) factors at Sanchez's sentencing I imposed a sentence—18 months' imprisonment—that represented a substantial variance from the applicable guideline range of 60 months' imprisonment.[8] I do not find that the circumstances have changed so

---

[8] The statutory maximum for the crime of conviction was 60 months' imprisonment, but for this statutory maximum Sanchez's guideline range was 63 to 78 months. (PSR ¶ 65.)

dramatically so as to warrant a sentence of time served.

> d. <u>Sanchez Has Failed to Demonstrate Extraordinary and Compelling Reason Warranting his Release from Custody</u>

Even if Sanchez met his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant release because of his alleged health risks, he has failed to establish that his release to an apartment in the Bronx puts him at a lower risk of contracting COVID-19 than if he were to remain in custody at the Jail.

Sanchez broadly claims that his "medical conditions, coupled with COVID-19's arrival and rapid spread in Orange County, NY, place his life in immediate danger", and that "[c]ontinued incarceration could, within a month or even a week, end [his] life. (Sanchez Comp. Rel. 1.) As support for this argument Sanchez cites data related to the spread of COVID-19 in Orange County as well as data related to the spread of COVID-19 in prisons. Sanchez argues that the information provided by the Jail concerning steps it has taken to protect inmates lacks certain relevant information "including the number of inmates and staff who have been tested, the number of inmates located at the jail, the housing conditions of those inmates, and whether inmates have been provided personal protective equipment or hygiene products." (Sanchez Reply 1.) Sanchez also argues that the protective measures put in place by the Jail are insufficient to protect inmates like him, "who have preexisting conditions that place them at heightened risk from COVID-19." (*Id*. 1-2, 10-11 ("But these actions, while better than no action at all, are insufficient to assure the Court that [Orange County Jail] is taking sufficient measures to address the enormity of the risk posed by COVID-19 to inmates like Mr. Sanchez, who live at heightened risk of severe complications, including death, as a result of their confinement at [Orange County Jail].").) Although the spread of COVID-19 in Orange County, the structural issues related to prisons, and the spread of COVID-19 within prisons, including

12

within the BOP, are all relevant to assessing the risk to Sanchez of contracting COVID-19, such data and facts do not warrant Defendant's conclusion that he is at a higher risk of contracting COVID-19 and suffering serious illness or death. Although Sanchez cites to certain data he claims supports this argument, he fails to adequately address data specifically related to the Jail.

Sanchez also fails to cite data from New York City or the Bronx in his effort to establish that there are extraordinary and compelling reasons for his release, and the implicit argument that he would be less likely to contract the virus by living in his apartment in the Bronx. The COVID-19 statistics for New York City and the Bronx compared to Orange County suggest Sanchez would be more at risk in New York City and the Bronx than in the Jail. Sanchez's request to be released from the Jail to live in his apartment in the Bronx until April 17, 2021, appears to be based upon the underlying assumption that the risk of him contracting COVID-19 is lower if he is permitted to live in his Bronx apartment. This assumption does not appear to be based upon any evidence other than Sanchez's generalization about COVID-19's spread in Orange County and within prisons generally.

As of April 24, 2020, the Jail did not have a single reported case of COVID-19 among its inmates; although seven staff members had tested positive for COVID-19. Sanchez does not appear to dispute the fact that the Jail does not have any inmate COVID-19 cases. (*See* Sanchez Reply 11.) Instead, Sanchez argues that "the government does not provide any indication of how many inmates or staff members have been tested", and that "[w]ithout that information, there is no reason to believe that zero inmates have contracted the coronavirus." (*Id*.) Sanchez's argument if flawed. As an initial matter, Sanchez has the burden to demonstrate extraordinary and compelling reasons warranting his release, and Sanchez fails to adequately address the Government's assertion that no inmate has tested positive for COVID-19. Instead, in lieu of

13

evidence supporting his position, Sanchez asks me—without any citation to supporting legal authority—to draw a "negative inference" against the Government. I decline to draw such an inference. Sanchez ignores the fact that the Jail has "a supply of COVID-19 test kits and currently has the ability to test anybody who medical professionals deem symptomatic based on CDC guidance." (Govt. Opp. 5.) There is no reason for me to believe that the Jail has not or would not test inmates or staff members who are exhibiting symptoms. Moreover, the blanket claim that the actions taken by the Jail are ineffective is a generalization and an overstatement and is belied by the fact that no inmate at the jail has tested positive for COVID-19.

The Jail is located in Goshen, Orange County, New York. (Sanchez Comp. Rel. 2.) The Jail had a pandemic plan before the COVID-19 outbreak. (Govt. Opp. 5.) The Jail has implemented various transmission mitigation measures. For example, currently at the Jail "all civilian and volunteer visits have been suspended", "programming which requires congregation has been suspended", and "inmates using recreation areas are required to practice social distancing". (*Id*.) The Jail "has also stopped receiving transfers [of inmates] from other facilities and is sheltering in place", and newly committed inmates "as well as any inmate leaving the facility for any reason and returns, are quarantined for 14 days and have their temperatures taken twice daily and are assessed throughout the quarantine period." (*Id*.) There is no question that these steps taken by the Jail, among others, are designed to limit the spread of COVID-19. Defendant does not appear to dispute the intent behind the implementation of these measures; instead, Sanchez argues that such measures are insufficient. (*See* Sanchez Reply 10 ("But these actions, while better than no action at all, are insufficient to assure the Court that [the Jail] is taking sufficient measures to address the enormity of the risk posed by COVID-19 to inmates like Mr. Sanchez, who live at heightened risk of severe complications, including death, as a

14

result of their confinement at [the Jail].").) Based upon the fact that there have been no reported cases of COVID-19 among inmates I find that the measures taken by the Jail appear to be working at this time.

Sanchez does not propose that he live alone in his Bronx apartment. Rather, he indicates that he intends to live with his wife, Raveena Sanchez, in a basement apartment located in 794 Fairmount Place, Bronx, New York (the "Apartment"). Prior to Defendant's sentencing, Ms. Sanchez was employed as the manager of a diner. (PSR ¶ 50.) Ms. Sanchez is a potential spreader of COVID-19, and Sanchez does not provide information relevant to assessing the risk to him from residing in the Apartment. Specifically, Sanchez does not provide any information concerning 794 Fairmount Place (the "Building"), or his wife. For example, Sanchez does not provide any information concerning whether: (1) any of the residents of the Building have had or currently have COVID-19; (2) the Building has implemented any measures to limit the spread of COVID-19 among Building residents and staff; (3) his wife had or has COVID-19; (4) other people will also live in the Apartment; (5) his wife is working and/or has other commitments that require her to interact with others; and (6) his wife has been practicing appropriate hygienic measures and social distancing. Without this information it is not possible to realistically assess the risk to Defendant of living in the Apartment in the Bronx.

Putting to the side the potential risk to Sanchez's health that his wife and living in the Building might pose, New York City has widely been considered the COVID-19 epicenter for the United States and the world. *See, e.g.*, Jesse McKinley, *New York City Region Is Now an Epicenter of the Coronavirus* Pandemic, NEW YORK TIMES (March 22, 2020) https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html. The

level of community spread of COVID-19[9] in New York City and Bronx County is materially greater than the level of community spread of COVID-19 in Orange County—where the Orange County Jail is located.  As of May 28, 2020, 20,844 people have died from, and 204,781 people have been infected with, COVID-19 in New York City, which translates to 1 death per 405 people and 1 person out of 41 people.  *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (last viewed May 28, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Spotlight&pgtype=Homepage.  In Bronx County—where Sanchez intends to live—as of May 28, 2020, there have been 4,093 deaths and 44,503 people infected with COVID-19, which translates to 284.7 deaths per 100,000 residents and 3,095.1 people infected per 100,000 residents.  *National*, *Deaths reported per 100,000 residents by county*, The Washington Post (last viewed May 28, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.  By contrast, as of May 19, 2020, in Orange County, New York—where the Orange County Jail is located—there has been 371 deaths and 10,292 people infected with COVID-19, which translates to 98.1 deaths per 100,000 residents and 2,721.1 people infected per 100,000 residents.  *Id.*  These statistics support the inference that Sanchez would be more at risk of contracting COVID-19 were he released and required to stay in his apartment in the Bronx than he would be by remaining in the Jail.

   Therefore, based upon the fact that (1) Sanchez intends to live with at least one other

---

[9] "Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."  *Frequently Asked Questions, Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention (last visited May 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#In-Case-of-an-Outbreak-in-Your-Community.

16

individual—his wife—in the Apartment and fails to provide details concerning his wife's contact with others and any hygiene protocols, if any, she may follow; (2) Sanchez fails to provide information about the Building and whether residents of the Building have or had COVID-19 and what steps, if any, the Building may be taking to mitigate the spread of COVID-19 among its residents; (3) there have been no reported COVID-19 cases in the Jail; (4) the lower levels of community spread and death in Orange County, the county where the Jail is located, than New York City and the Bronx; and (5) the high levels of community spread and death in the Bronx and in New York City, I find that Defendant has failed to meet his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his release.

### e. Danger to the Community

The relevant section of the Sentencing Guidelines that applies to compassionate release requests provides that a court may reduce the term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction," *id*. § 1B1.13(1)(A); (2) "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id*. § 1B1.13(2); and (3) "the reduction is consistent with this policy statement," *id*. § 1B1.13(3). The factors courts consider in assessing a defendant's potential dangerousness include: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the Defendant; (3) the Defendant's history and characteristics, such as his family ties, employment, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that the Defendant's release would present. *See* 18 U.S.C. § 3142(g).

The Government argues that Defendant is a danger to the community. Sanchez responds that his imprisonment to date for the instant offence, the current health crisis, and the potential

punishment he would face were he to violate the terms of his release serve to diminish any danger he might pose to the community. I disagree since the evidence belies such a conclusion.

No prior detention determination has previously been made in this case since Defendant consented to detention and never sought bail prior to being sentenced. (*See* Doc. 5.) The fact that Defendant did not seek bail after his arrest can be considered evidence that he viewed the prospects of obtaining bail to be remote, including because he violated his parole by his involvement in the instant offense. In reviewing the record before me I find that Defendant presents a danger to the community, and that this danger is not sufficiently mitigated by the current circumstances and the home confinement he proposes.

As an initial matter, Sanchez committed the instant offense less than three weeks after his release from his previous incarceration. (Govt. Opp. 7.) He also committed the instant offense while on state parole. (PSR ¶ 40.) One would expect that having just been released from a substantial jail sentence and being on parole that Sanchez would have been incentivized to scrupulously avoid activities that could be viewed as potentially criminal and a violation of his parole. Instead, within days of his release from state custody he was carrying a loaded weapon on the streets of the Bronx. This fact is evidence of Sanchez's inability to obey the law, an inability to adhere to any terms of release that might be imposed, and, therefore, that he poses a danger to the public.

Sanchez also has two prior convictions for robberies, each of which involved violence. (PSR ¶¶ 36, 38.) During the first robbery committed on or about January 25, 2014, Sanchez along with others—including his now wife Raveena Sanchez—attempted to rob a victim. Sanchez, among other things, choked the victim, and Raveen Sanchez hit the victim in the face with closed fists. (PSR ¶ 36.) During the other robbery, the victim was held at gunpoint.

Defendant's involvement in violence is mirrored in the instant offense where he was carrying a loaded gun and became involved in a confrontation that either resulted in him being shot or his shooting himself during a shootout with one or more individuals. Sanchez's motion and the terms of bail he proposes do not adequately address the specter of danger raised by his participation in these acts. Therefore, I agree with the Government that "Sanchez is a recidivist violent criminal with multiple convictions related to guns, and he therefore presents the obvious risk that he will threaten the community by returning to violence upon his release." (Govt. Opp. 7.) Accordingly, I find that Sanchez fails to demonstrate that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)".

### III.    Conclusion

My decision in this case is based on the unique circumstances of Defendant Sanchez and the context in which his motion has been made. For the reasons stated above, I find that Sanchez has not sufficiently established extraordinary and compelling circumstances justifying the reduction in his sentence and his release from custody, nor has he demonstrated that he is not a danger to the community; therefore, Defendant's motion for compassionate release is DENIED.

SO ORDERED.

Dated:    May 29, 2020
         New York, New York

Vernon S. Broderick
United States District Judge